# Exhibit 1

Execution Version

**A and A Shareholding Co., LLC**
**Equity Restructuring – Binding Term Sheet**

August 14, 2019

This binding term sheet (this "**Term Sheet**") by and between LC A&A Intermediate Investors LLC ("**Lion**") and Carolyn Rafaelian (together with her affiliate vehicles, the "**Founder**") (each of Lion and the Founder shall be referred to as a "**Party**", and together, the "**Parties**") is entered into on the date hereof and sets forth certain terms of the restructuring of the equity of A and A Shareholding Co., LLC (the "**Company**") to be consummated by the Parties at the Closing (as defined below). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Second Amended and Restated Limited Liability Company Agreement of the Company, dated as of September 28, 2012 (as amended, restated or modified from time to time, the "**LLC Agreement**").

| | |
|---|---|
| **Second Lien Term Loans; Equity Participation; Founder-Lion Loan** | • At the closing of the transactions contemplated by this Term Sheet (the "**Closing**"), (i) Lion shall make a second lien term loan to the Company in an amount equal to $13,000,000 (the "**Lion Term Loan**") and (ii) Founder shall make a second lien term loan to the Company in an amount equal to $7,000,000 (the "**Founder Term Loan**", and together with the Lion Term Loan, the "**Second Lien Term Loans**") |
| | • Immediately prior to the Closing, Lion will make a term loan to the Founder in an aggregate principal amount of $5,000,000 which shall be used by the Founder solely to fund, in part, the Founder Term Loan (such loan, the "**Lion-Founder Loan**") |
| | • The Lion-Founder Loan will mature nine months after the Closing, with the full principal and interest amount thereof payable at maturity, and shall accrue interest at a rate equal to 3.5% per annum; provided, that if an event of default occurs under the Lion-Founder Loan, the interest rate shall then be increased to 15.0% per annum |
| | • The Lion-Founder Loan will be full recourse to the Founder and will be secured by (i) the Founder's Class A Units (as defined below) and other equity interests in the Company held by the Founder and affiliated investment vehicles (which shall include a voting proxy in favor of Lion) and (ii) a first priority mortgage on the Founder's real property located in Venice Beach, California |
| | • In connection with the Second Lien Term Loans, each of Lion and Founder will receive Class A Units (the "**Class A Units**"), representing 75% of the fully diluted ownership of the Company |
| | • The remaining 25% ownership to be represented by Class B Units to be split 15% to the Founder and 10% to Lion, proportionate to each of Founder and Lion's |

| | |
|---|---|
| | pre-Closing ownership of the common equity of the Company.  Attached hereto as <u>Annex A</u> is a cap table of the Company reflecting the post-Closing ownership of the Company's equity |
| | • Pursuant to and subject to the terms listed in Exhibit A to that certain Commitment Letter entered into on the date hereof by and among the Loan Parties and the Lenders (each as defined therein), the principal amount of the Second Lien Term Loans shall be payable in full at maturity and shall accrue interest at a rate equal to 15.0% per annum, which shall be payable in kind until the maturity date; for the avoidance of doubt, repayment of the Second Lien Term Loans in full (including, but not limited to, principal and interest thereon) shall occur prior to any distributions in respect of any equity |
| | • Thereafter, to the extent permitted by the applicable loan documents, distributions will be made to all holders of Class A Units, Class B Units and Incentive Units, pro-rata |
| **Board Composition** | • Board of Managers (the "**Board**") to be comprised of five members: <br>      o Three directors to be appointed by Lion <br>      o One director to be appointed by the Founder <br>      o One independent director designated by the majority of the Board <br><br> • Subject to certain veto rights to be granted to the Founder (as further described below), Lion, through the Board, will have control over strategic and operational decisions of the Company |
| **Founder Matters** | • The Founder will hold the title of "Chief Creative Officer" and shall continue to serve as an employee of the Company pursuant to and subject to the terms of her current employment (including yearly salary of $508,820 and bonus at the Board's discretion to be determined based on the performance of the business) <br><br> • For the two years following the Closing, the Company shall fund the Current State and Tri-Alchemy lines of business up to a total amount of $1 million per year, such amount to include all research and development costs and operating losses of such lines of business <br><br> • Upon the earlier of (i) a sale of the Company, (ii) the dismissal of the Founder (for any reason – whether the Founder is dismissed or resigns voluntarily) or (iii) two years after the Closing, the Company shall transfer the intellectual property relating to the Current State and Tri-Alchemy lines of business to |

| | |
|---|---|
| | the Founder and into the Founder's name (the "<u>IP Transfer</u>"); <u>provided</u>, that in the case of (i) or (iii) in the preceding sentence, the Founder shall be removed as an employee of the business at the closing of the IP Transfer unless the Founder has elected not to consummate the IP Transfer. The IP Transfer shall constitute full and complete severance for the Founder |
| | • As a condition precedent to and in consideration for the IP Transfer, at the closing of the IP Transfer, the Founder shall be required to execute and deliver (i) a customary release of any and all claims against Holdings LLC and its Subsidiaries and Lion, which shall cover all conduct occurring prior to the closing of the IP Transfer, and which shall be in a form as of Closing that is mutually agreed by the Parties and (ii) a non-hire and non-solicitation agreement for a period of three (3) years in favor of Holdings LLC and its Subsidiaries in respect of the employees of Holdings LLC and its Subsidiaries, in the case of each of (i) and (ii), in a form reasonably satisfactory to the Board; <u>provided</u>, that the Founder shall be permitted to hire for employment up to three (3) then current employees of the Company and its Subsidiaries. For the avoidance of doubt, the obligations of the Founder under (i) and (ii) in the preceding sentence shall be effective as of the date of the actual transfer of intellectual property in the IP Transfer |
| **Preemptive Rights** | • Founder will have customary preemptive rights on future issuances of Equity Securities in order to maintain its economic ownership interest in the Company in respect of its Equity Securities, except for customary exceptions consistent with the current LLC Agreement (including issuances to banks or other financial institutions, issuances pursuant to acquisitions approved by the Board and issuance to managers and executives) |
| **Information Rights** | • Founder will have customary information rights consistent with the existing LLC Agreement, which include that the Company will keep and provide reasonable access to the appropriate books and records with respect to its business, deliver audited annual financial statements within 120 days after each fiscal year end, and unaudited quarterly consolidated financial statements within 60 days after each quarter, in each case subject to customary confidentiality obligations |
| **Veto Rights** | • Founder will have veto rights preventing the Members, the Company and the Board from taking certain actions as listed under <u>Annex B</u> to this Term Sheet |

| | |
|---|---|
| **Drag-Along Rights; Right of First Offer** | • On or after June 30, 2022, subject to the Founder's right of first offer described below, Lion shall have the right to unilaterally cause a sale of the Company (such sale, a "**Drag-Along Sale**")<br><br>• Prior to initiating a Drag-Along Sale, Lion shall be required to deliver a notice of its intention to initiate a Drag-Along Sale to the Founder, upon which the Founder will have a 60 days period to make an offer to Lion for the purchase of all (but not less than all) of Lion's equity in the Company (any such offer, the "**Founder Offer**")<br><br>• If Lion rejects the Founder Offer, Lion may sell the Company (and cause the Founder to sell its equity in the Company) only pursuant to an offer representing at least 105% of the equity value set forth in the Founder Offer and so long as such offer reflects an enterprise value of at least $400M<br><br>• An IPO on a national exchange valuing the Company at an enterprise value of at least $400M (a "**Qualified IPO**") will not be subject to the right of first offer described above<br><br>• Lion may not initiate a Drag-Along Sale more than once in any twelve-month period |
| **Exit Sale** | • On or after June 30, 2024, to the extent that a sale transaction is not already pending at such time, each of Lion and the Founder shall have a right to cause the sale of the Company (an "**Exit Sale**")<br><br>• Upon an election of either Party to initiate an Exit Sale (or if the Parties jointly agree to initiate an Exit Sale), the Parties shall be obligated to cause the Company to engage an investment banking firm of national reputation to represent the Company in the Exit Sale and solicit bona fide offers from prospective purchasers<br><br>• The bona fide offer that reflects the highest present value of the aggregate cash consideration to the Parties shall be elected by the Parties (jointly) or by the Party initiating such Exit Sale (if not jointly) as the winning offer |
| **Transfer Restrictions; Tag-Along** | • Consistent with the current LLC Agreement, Lion may transfer its Units at any time subject to tag-along rights in favor of the Founder<br><br>• The Founder may transfer its Units with the Board's consent (not be unreasonably withheld) subject to (i) a right of first refusal in favor of the Company and Lion (with terms consistent with the terms provided in the current LLC Agreement) and (ii) tag-along rights in favor of Lion |

| | |
|---|---|
| | • Transfers to a Party's Family Group or controlled Affiliates shall be permitted and not subject to tag-along rights. For the avoidance of doubt, any other transfer or sale by Lion (other than pursuant to a Drag-Along Sale, an Exit Sale, an IPO or a reorganization into a successor entity) will be subject to tag-along rights in favor of the Founder |
| **Closing** | • The Closing of the transactions contemplated by this Term Sheet shall occur and be effective upon the date on which the restructuring of the Company's indebtedness with the Company's lenders is consummated.   The Parties shall make the Second Lien Term Loans to the Company at Closing |
| **Confidentiality** | • Neither the existence of this Term Sheet nor any of its terms or substance shall be disclosed to any person or entity, directly or indirectly, except (a) as may be compelled to be disclosed in a judicial or administrative proceeding or as otherwise required by law, (b) on a confidential and "need to know" basis, to affiliates and advisors of a Party or of the Company who are directly involved in the consideration of this matter and (c) to the Company's debt financing sources |
| **Mutual Releases** | • Effective automatically and immediately upon the Closing, the Parties, each on behalf of itself and any Person claiming by, through or under any such Party, and each of the predecessors, successors, successors-in-interest, assigns, heirs and representatives of each of the foregoing Persons, hereby forever waives, releases and discharges the other Party and each released Party's current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all claims that such releasing party now has or may have in the future against any or all of the released parties based in whole or in part on facts existing or arising, whether known or unknown, on or before the Closing, that relate to, arise out of or otherwise are in connection with: (i) any act or omission, agreement, circumstance, event or other occurrence related to the Company, the management thereof, including by the Board, and/or the LLC Agreement and (ii) any aspect |

| | |
|---|---|
| | of the dealings or relationships between or among any or all of the released parties relating the foregoing and/or anything relating to or arising out of their business relationship; <u>provided</u>, however, that the foregoing shall not release the Parties from their respective obligations under this Term Sheet or the other definitive documents to which they are a party or are bound subsequent to the execution of this term sheet. |
| **Exculpation** | • From and after the Closing, the Founder shall exculpate Lion and its current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, from any claim or cause of action in connection with or arising out of this Term Sheet, the Company (including the management thereof or any actions in connection with serving on the board of directors thereof) and/or the transactions contemplated hereby, other than claims or causes of action arising out of or related to any act or omission of an exculpated party hereunder that is a criminal act or constitutes intentional fraud as finally determined by a court of competent jurisdiction |
| **Expenses** | • Each Party shall bear its own costs and expenses in connection with the consummation of the transactions contemplated by this Term Sheet; <u>provided</u>, that reasonable and documented attorney's fees incurred by the Parties in connection with the matters contemplated by this Term Sheet will be reimbursed by Alex & Ani, LLC at Closing |
| | • If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under this Term Sheet or any document contemplated by this Term Sheet with respect to any of the transactions contemplated hereby against any other Party, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing Party in such litigation, arbitration or proceeding shall be reimbursed by the losing Party; provided, that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or |

| | |
|---|---|
| | proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis |
| **Governing Law** | • This Term Sheet shall be governed by the internal laws of the state of Delaware without regard to conflicts of law principles |
| **Binding Nature** | • This Term Sheet shall constitute a binding commitment on the part of the Parties. Prior to the Closing, each Party shall cooperate in good faith to memorialize the terms set forth in this Term Sheet in more detailed agreement(s); provided, that unless and until any such more detailed agreement(s) are executed by the Parties, the terms of this Term Sheet shall be binding with respect to the matters agreed herein |

**IN WITNESS WHEREOF**, the undersigned, each intending to be legally bound hereby, have executed this Term Sheet as of the date first above written.

**LC A&A Intermediate Investors LLC**

By: _____

Name: SHERIF GUIRGIS
Title: PRESIDENT

_____

**Carolyn Rafaelian**

**IN WITNESS WHEREOF**, the undersigned, each intending to be legally bound hereby, have executed this Term Sheet as of the date first above written.

**LC A&A Intermediate Investors LLC**

By:_____
  Name:
  Title:

_____
**Carolyn Rafaelian**

**ACKNOWLEDGED AND AGREED:**

A and A Shareholding Co., LLC

By: _____

    Name: Carolyn Rafaelian

    Title: Chief Executive Officer

Alex and Ani, LLC

By: _____

    Name: Carolyn Rafaelian

    Title: Chief Executive Officer

**Annex A – Post-Closing Capitalization Table**

| UNITHOLDER AND ADDRESS | UNITS |
|---|---|
| | |
| Carolyn Rafaelian | 8,751,750 Class A Units |
| | |
| Entities controlled by Lion | 16,253,500 Class A Units |
| | |
| **TOTAL CLASS A** | **25,005,000 Class A Units** |
| | |
| Alex and Ani Pledge Co. | 5,000,000 Class B Units |
| | |
| Carolyn Rafaelian | 1,000 Class B Units |
| | |
| Entities controlled by Lion | 3,334,000 Class B Units |
| | |
| **TOTAL CLASS B** | **8,335,000 Class B Units** |
| | |
| **TOTAL** | **33,340,000 Units** |

**Annex B – Veto Rights**

- A sale of the Company, other than as provided in the Term Sheet and other than pursuant to a Qualified IPO

- The issuance or incurrence of indebtedness by the Company or any of its Subsidiaries, other than (i) pursuant to the Company's existing debt facility or a similar facility with a similar bank or similar group of banks as receivables and inventory grow on a formula basis or (ii) refinancing of the existing debt facility up to a leverage of 4.5 times LTM EBITDA

- The acquisition of third-party entities or their assets, in any case above $1 million in the aggregate in any fiscal year

- Any transaction, including a loan or advance, with any affiliate of the Company (other than a wholly-owned Subsidiary) or any employee, other than certain existing transactions and loans specified in the LLC Agreement

- Any fundamental change to the Business

- Any decision not to enforce any of the Company's material intellectual property rights

- Any increase in any fiscal year in any employee's annual compensation by more than the greater of 25%

- Any incremental marketing expenditures exceeding 10% of the Company's gross revenues for the twelve consecutive preceding months

- Taking certain material actions with respect to tax or other regulatory filings, elections, claims, agreements, and proceedings relating to the Company and its Subsidiaries

- Any decision to change the size or composition of board