# Exhibit 4

**EXECUTION VERSION**

# INVESTOR MATTERS AGREEMENT

This INVESTOR MATTERS AGREEMENT (this "<u>Agreement</u>"), dated as of September 13, 2019, is entered into by and among LC A&A Intermediate Investors LLC ("<u>Lion</u>"), a Delaware limited liability company, Alex and Ani Pledge Co., a Rhode Island corporation ("<u>Pledge Co.</u>"), Carolyn Rafaelian (together with her affiliated investment vehicles, including Pledge Co., the "<u>Founder</u>") (each of Lion and the Founder, an "<u>Investor</u>", and together, the "<u>Investors</u>"), A and A Shareholding Co., LLC, a Delaware limited liability company (the "<u>Company</u>"), and Alex and Ani, LLC, a Delaware limited liability company ("<u>Alex and Ani</u>", and each of the Investors, the Founder, the Company and Alex and Ani a "<u>Party</u>", and collectively, the "<u>Parties</u>").

WHEREAS, on August 14, 2019, the Parties have entered into that certain Binding Term Sheet (the "<u>Term Sheet</u>") with respect to a proposed restructuring of the Company and Alex and Ani (the "<u>Restructuring</u>");

WHEREAS, at the closing of the Restructuring on the date hereof (the "<u>Closing</u>"), each Investor will make a loan to Alex and Ani pursuant to the Second Lien Debt Facility (as defined in the LLC Agreement (as defined below) (the "<u>Second Lien Term Loans</u>");

WHEREAS, immediately prior to the Closing, Lion has made a cash loan to the Founder under that certain Secured Promissory Note (the "<u>Lion-Founder Note</u>"), the proceeds of which shall be used by the Founder to fund a portion of the Second Lien Term Loan made by the Founder to Alex and Ani at Closing, and which loan has been secured by that certain Pledge Agreement entered into by Lion and the Founder on the date hereof (the "<u>Pledge Agreement</u>") and that certain Mortgage made by the Founder in favor of Lion on the date hereof (the "<u>Mortgage</u>", and collectively with the Lion-Founder Note and the Pledge Agreement, the "<u>Lion-Founder Note Documents</u>");

WHEREAS, at the Closing, the Investors and the Company will enter into that certain Third Amended and Restated Limited Liability Company Agreement of the Company (the "<u>LLC Agreement</u>"), in order to, among other things, (i) effectuate a recapitalization of the equity of the Company pursuant to which (a) all of the outstanding Class A Units of the Company will be reclassified and renamed Class B Units (such that one Class A Unit is equal to one Class B Unit) and (b) on the terms and subject to the conditions set forth in the applicable Investor Subscription Agreement to be entered into at Closing by each Investor, on the one hand, and the Company, on the other hand (the "<u>Subscription Agreements</u>", and collectively with this Agreement, the Second Lien Term Loans and the Lion-Founder Note Documents, the "<u>Transaction Agreements</u>", and the transactions contemplated by the Transaction Agreements, the "<u>Transactions</u>"), each of Pledge Co. and Lion will be issued new Class A Units in the Company; and

WHEREAS, in connection with the consummation of the Restructuring and the Transactions, and in exchange and consideration for the Parties entering into the Transaction Agreements and Lion making the loan to the Founder pursuant to the Lion-Founder Note, the Parties have agreed to enter into this Agreement in order to, among other things, release each other from certain Claims (as defined below), the Founder exculpating Lion from certain Claims and to set forth other agreements relating to the Investors following the consummation of the Transactions, in each case, in accordance with and subject to the terms set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Mutual Release.**

(a)     Effective automatically and immediately upon the Closing, the Investors, each on behalf of itself and any person claiming by, through or under any such Investor, and each of the predecessors, successors, successors-in-interest, assigns, heirs and representatives of each of the foregoing persons (but in each case, other than the Company and its subsidiaries), hereby forever waives, releases and discharges the other Investor and each such other Investor's current and former affiliates (including the Company and each of its direct and indirect subsidiaries), and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, from any and all Claims that such releasing party now has or may have in the future against any or all of the released parties based in whole or in part on facts existing or arising, whether known or unknown, on or before the Closing, that relate to, arise out of or otherwise are in connection with: (i) any act or omission, agreement, circumstance, event or other occurrence related to the Company or Alex and Ani, the management thereof, including by the board of managers of the Company (the "Board"), and/or the LLC Agreement or the Operating Agreement of Alex and Ani and (ii) any aspect of the dealings or relationships between or among any or all of the released parties relating the foregoing and/or anything relating to or arising out of their business relationship; provided, however, that the foregoing shall not release the Parties from their respective obligations under the Transaction Agreements. For all purposes of this Agreement, "Claims" shall mean all claims (including, without limitation, crossclaims, counterclaims, and rights of setoff and/or recoupment), actions, causes of action, charges, complaints, suits, investigations, proceedings, debts, dues, sums of money, accounts, reckonings, interests, liens, liabilities, promises, warranties, damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, extents, executions, rights, torts, losses, rights to reimbursement, subrogation, contribution, indemnification or other payment, attorneys' fees, costs, expenses or other claims of whatever nature or kind, in each case whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, suspected or unsuspected, accrued or unaccrued, direct or indirect, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise.

(b)     Each Investor expressly acknowledges that the release set forth in this Agreement is intended to include in its effect, without limitation, claims that such Investor did not know or suspect to exist in its favor at the time of execution hereof, regardless of whether the knowledge of such claims, or the facts upon which they might be based, would materially have affected the settlement of this matter, and that the consideration given under this Agreement is also for the release of those claims and contemplates the extinguishment of any such unknown claims.  In furtherance of this settlement, each Investor waives any rights it may have under

2

California Civil Code Section 1542 (and other similar statutes and regulations).  Section 1542 states:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

2.     **Exculpation.**  From and after the Closing, the Founder shall exculpate Lion and its current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, from any Claim in connection with or arising out of the Transaction Agreements and the Transactions, the Company and Alex and Ani (including the management thereof or any actions in connection with serving on the Board) and/or the transactions contemplated hereby, other than Claims arising out of or related to any act or omission of an exculpated party hereunder that is a criminal act or constitutes intentional fraud, in each case, as finally determined by a court of competent jurisdiction.

3.     **Founder Matters.**

(a)     <u>Employment</u>.  From and after the Closing, the Founder will hold the title of "Chief Creative Officer" of the Company and its subsidiaries and shall continue to serve as an employee of the Company pursuant to and subject to the terms of her current employment (including yearly salary of $508,820 and bonus at the Board's discretion to be determined based on the performance of the business of the Company).  The Parties acknowledge and agree that the Founder's employment is and shall continue to be at-will (as defined under applicable law) consistent with the terms of that certain Key Contributor Agreement, dated as of September 28, 2012, by and between the Company and Carolyn Rafaelian.

(b)     <u>Current State and Tri-Alchemy</u>. For a period of two (2) years following the Closing, the Company shall fund the operations of the Current State and Tri-Alchemy lines of business of Alex and Ani up to a total amount of $1 million per year, such amount to include all research and development costs and operating losses of such lines of business; <u>provided</u>, that the Company's obligations pursuant to this Section 3(b) shall terminate and be of no further force and effect upon the termination of employment of the Founder with the Company for any reason, whether the Founder is removed or resigns voluntarily.

(c)     <u>Intellectual Property Transfer</u>.  Upon the earlier to occur of (i) a "Sale Transaction" (as defined in the LLC Agreement), (ii) the termination of employment of the Founder with the Company for any reason, whether the Founder is removed or resigns voluntarily, or (iii) two (2) years after the Closing, the Parties shall enter into an intellectual property transfer and assignment agreement in the form attached hereto as <u>Exhibit A</u> (the "<u>Assignment Agreement</u>"), pursuant to which the intellectual property listed on <u>Schedule A</u> attached thereto shall be transferred and assigned to the Founder and into the Founder's name

(the "IP Transfer", and the date of the closing of the IP Transfer, the "IP Transfer Date"), in exchange for (and conditioned upon) the Founder entering into the Release and Covenant Agreement (as defined below); provided, that in the case of (i) or (iii) in the preceding sentence, the Founder's employment with the Company shall be terminated on the date on which the Parties enter into the Assignment Agreement unless the Founder has elected in writing not to consummate the IP Transfer, and upon the Founder making such election in writing, all of the Parties' rights and obligations in respect of the IP Transfer hereunder shall be null and void.  If and when consummated in accordance with the term hereof, the IP Transfer shall constitute full and complete severance for the Founder in connection with the Founder's termination of employment with the Company and its subsidiaries. The IP Transfer date shall occur automatically on the 8th day following the Parties entering into the Assignment Agreement and the Release and Covenant Agreement, unless the release with respect to claims arising under the ADEA (as defined in the Release and Covenant Agreement) under the Release and Covenant Agreement was revoked by the Founder, in which case the IP Transfer shall not occur and the parties' right and obligations under the Assignment Agreement shall be null and void.

(d)     Release and Restrictive Covenant Agreement. As a condition precedent to and in consideration for the IP Transfer, the Founder hereby agrees and covenants to, on the date on which the parties will enter into the Assignment Agreement, execute and deliver an agreement of a release of claims and certain restrictive covenants, in the form attached hereto as Exhibit B (the "Release and Restrictive Covenant Agreement"). In the event that the Founder revokes the release with respect to claims arising under the ADEA (as defined in the Release and Covenant Agreement) under the Release and Covenant Agreement, the IP Transfer shall not occur and the Release and Restrictive Covenant Agreement shall be null and void (other than Section 1 thereof).

4.     **Representations and Warranties**.

(a)     The Founder's Representations and Warranties.  Each of Carolyn Rafaelian and Pledge Co. represents and warrants to each of the other Parties that:

(i)     Authority.  Each of Carolyn Rafaelian and Pledge Co. has the legal capacity to execute, deliver and perform this Agreement and the other Transaction Agreements.  This Agreement constitutes a valid and legally binding obligation of each of Carolyn Rafaelian and Pledge Co., enforceable against such party in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(ii)     Non-Contravention.  Each of Carolyn Rafaelian and Pledge Co. is legally free to make and perform this Agreement and the other Transaction Agreements and has no obligation to any other person that would affect or conflict with any of such party's obligations hereunder or thereunder, and the complete performance of such party's obligations hereunder and thereunder will not violate any contract by which such party is bound.

4

(iii)     No Transactions Outside the Ordinary Course.  Since January 31, 2018, except for the transactions contemplated by the Transaction Agreements and except as set forth on Schedule 4(a)(iii) attached hereto, the business of the Company and its subsidiaries has been conducted in all material respects in the ordinary course of business consistent with past practice and no material assets or rights of the Company or any of its subsidiaries were directly or indirectly sold, transferred, assigned, pledged, mortgaged, exchanged, hypothecated, granted as a security interest or otherwise directly or indirectly deposited or encumbered (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) other than in the ordinary course of business consistent with past practice.

(iv)     Survival.  The foregoing representations and warranties shall survive the effectiveness of this Agreement.

(b)     Lion's Representations and Warranties.  Lion represents and warrants to each of the other Parties that:

(i)     Authority.  Lion has the legal capacity to execute, deliver and perform this Agreement and the other Transaction Agreements.  This Agreement constitutes a valid and legally binding obligation of Lion, enforceable against Lion in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(ii)     Non-Contravention.  Lion is legally free to make and perform this Agreement and the other Transaction Agreements and has no obligation to any other person that would affect or conflict with Lion's obligations hereunder or thereunder, and the complete performance of Lion's obligations hereunder and thereunder will not violate any contract by which Lion is bound.

(iii)     Survival.  The foregoing representations and warranties shall survive the effectiveness of this Agreement.

5.     **Other Provisions**.

(a)     Costs and Expenses.

(i)     Each Party shall bear its own costs and expenses in connection with the consummation of the Transactions; provided, that reasonable and documented attorney's fees and expenses incurred by the Parties in connection with the Transactions will be reimbursed by Alex & Ani, LLC at Closing.

(ii)     If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under any of the Transaction Agreements against any other Party, all fees, costs and expenses, including, without limitation, reasonable attorney's fees and court costs, incurred by the prevailing Party in such litigation, arbitration or proceeding shall be reimbursed by the losing Party;

provided, that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis.

(b)     Entire Agreement.  This Agreement, together with the other Transaction Agreements, represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, written or oral, with respect thereto.

(c)     Waivers and Amendments.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  Except as expressly set forth herein, no waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(d)     Governing Law.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement, will be governed by and construed in accordance with the Laws of the State of Delaware without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

(e)     Process.  Each Party hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof to the address set forth next to such Party's signature in the signature pages attached hereto.

(f)     Waiver of Jury Trial.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS WAIVER OF JURY TRIAL.

(g)     <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that money damages or legal remedies would not be an adequate remedy for any such damages and it is accordingly agreed that each Party shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which such Party is entitled at law or in equity, and in seeking an injunction, a decree or order of specific performance, it shall not be required to provide any bond or other security in connection therewith.

(h)     <u>No Third Party Beneficiaries; No Assignment</u>.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No Party may assign its rights or obligations hereunder without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed.  No assignment shall relieve the assigning Party of any of its obligations hereunder.

(i)     <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(j)     <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first set forth above.

**CAROLYN RAFAELIAN**

By: _____

**ALEX AND ANI PLEDGE CO.**

By: _____
Name:   Carolyn Rafaelian
Title:   President

*[Signature Page to Investor Matters Agreement]*

**LC A&A INTERMEDIATE INVESTORS, LLC**

By: _____

Name:   Sherif Guirgis

Title:    President

*[Signature Page to Investor Matters Agreement]*

**A AND A SHAREHOLDING CO., LLC**

By: _____

Name:   Robert Trabucco
Title:    Chief Restructuring Officer

[*Signature Page to Investor Matters Agreement*]

**ALEX AND ANI, LLC**

By: _____

Name:   Robert Trabucco

Title:   Chief Restructuring Officer

*[Signature Page to Investor Matters Agreement]*

**Schedule 4(a)(iii)**

None.

**Exhibit A**

**Form of Assignment Agreement**

(See attached)

**TRADEMARK ASSIGNMENT**

This TRADEMARK ASSIGNMENT ("*Assignment*") is entered into as of [●], by ALEX AND ANI, LLC a Rhode Island limited liability company ("*Assignor*") in favor of CAROLYN RAFAELIAN ("*Assignee*") and will become automatically effective on the 8th day following the occurrence of the earlier of (i) a Sale Transaction (as defined in Investor Matters Agreement defined below) (ii) the termination of employment of the Founder (as defined in the Investor Matters Agreement defined below) with the Assignor for any reason, the Founder is removed or resigns voluntarily, or (iii) two (2) years after the Closing Date (as defined in the Investor Matters Agreement defined below), provided, in each case of (i) through (iii), that if the release with respect to claims arising under the ADEA (as defined in the Release and Covenant Agreement as defined in the Investors Matters Agreement) under the Release and Covenant Agreement was revoked by the Founder, the transactions pursuant to this Trademark Assignment shall not occur and the parties' rights and obligations hereunder shall be null and void (the "*Effective Date*").

WHEREAS, Assignor owns all right, title and interest in and to the trademarks and tradenames identified and set forth on <u>Schedule A</u> attached hereto, and all goodwill associated therewith (collectively, the "*Marks*");

WHEREAS, pursuant to that certain Investor Matters Agreement, dated as of the date hereof, by and among Carolyn Rafaelian, Alex and Ani Pledge Co., LC A&A Intermediate Investors LLC, A and A Shareholding Co., LLC and the Assignor (the "*Investor Matters Agreement*"), Assignor shall assign the Marks to the Assignee on the Effective Date;

WHEREAS, Assignee is the successor to that portion of the assets of the business of the Assignor to which the Marks pertain and such business is ongoing; and

WHEREAS, Assignor wishes to assign to Assignee, and Assignee wishes to acquire from Assignor, all worldwide right, title and interest in and to the Marks and all goodwill associated with the Marks.

NOW, THEREFORE, for good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Assignor hereby agrees:

1.     Assignor hereby irrevocably sells, contributes, transfers, grants, bargains, assigns and conveys to Assignee, free and clear of any and all liens and encumbrances, the entire right, title and interest in, to and under the Marks, together with the goodwill of the business associated therewith, for the United States and for all foreign countries and multi-national registration bodies, including, without limitation, any registrations and applications therefor, any renewals and extensions of the registrations and all corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter arising or in effect, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, together with all rights to collect royalties, products and proceeds in connection with any of the foregoing and all rights to sue for past, present or future

infringement, misappropriation, unfair competition, dilution or other violation of the foregoing, and all rights to recover damages or lost profits in connection therewith, and all rights corresponding thereto throughout the world.

2.    Assignor shall provide Assignee, its successors and assigns, and their legal representatives such information, documents and assistance as Assignee or any such other person or entity may reasonably request (including, without limitation, execution and delivery of any affidavits, declarations, oaths or other documents as may reasonably be required) in connection with:  (1) the preparation of any application for registration or any application for renewal of any Mark; (2) the prosecution or defense of any infringement or other proceedings that may arise in connection with any of the Marks including, but not limited to, testifying as to any facts relating to the Marks assigned herein and this Assignment; (3) obtaining any additional protection for the Marks that Assignee reasonably may deem appropriate that may be secured under the laws now or hereafter in effect in the United States, foreign countries and multinational authorities; and (4) effectuating and implementing this Assignment.

3.    Assignor hereby represents, warrants and covenants that it has all rights necessary to enter into this Assignment, and it has not executed and will not execute any agreement in conflict with this Assignment.

4.    This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of New York. The terms of Sections 11.14 and 11.15 of that certain Second Lien Credit Agreement by and among the Assignor, A and A Shareholding Co., LLC, certain subsidiaries of the Assignor party thereto, lenders party thereto and Wilmington Trust, National Association, dated as of the date hereof, are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

5.    This Assignment may be signed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.    This Assignment is entered into pursuant to the Investor Matters Agreement, to which reference is made for any further statement of the rights and obligations of Assignor and Assignee with respect to the Marks.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be executed in Assignor's name by Assignor's duly authorized officer as of the date first above written.


**ALEX AND ANI, LLC**


By: _____

Name:

Title:


Acknowledgement:


**CAROLYN RAFAELIAN**


_____

**Schedule A**
**to Trademark Assignment**

| Trademark | Database | Application Number | Application Date | Goods and Services |
|---|---|---|---|---|
| CURRENT STATE | U.S. Federal | 88175407 | 10/30/2018 | (INT. CL. 41) PROVIDING FITNESS INSTRUCTION SERVICES IN THE FIELD OF YOGA; ENTERTAINMENT SERVICES, NAMELY, PROVIDING PODCASTS IN THE FIELD OF YOGA |
| CURRENT STATE | U.S. Federal | 88175406 | 10/30/2018 | (INT. CL. 35) ON-LINE RETAIL STORE SERVICES FEATURING JEWELRY, WATCHES AND FASHION ACCESSORIES; RETAIL STORE SERVICES FEATURING JEWELRY, WATCHES AND FASHION ACCESSORIES |
| CURRENT STATE | U.S. Federal | 88175400 | 10/30/2018 | (INT. CL. 28) STRETCH BANDS USED FOR YOGA AND PHYSICAL FITNESS PURPOSES; YOGA BLANKETS; YOGA BLOCKS; YOGA STRAPS, YOGA CUSHIONS AND YOGA GLOVES |
| CURRENT STATE | U.S. Federal | 88175397 | 10/30/2018 | (INT. CL. 27) BAGS SPECIALLY ADAPTED FOR YOGA MATS; YOGA MATS AND YOGA TOWELS SPECIALLY ADAPTED FOR YOGA MATS |
| CURRENT STATE | U.S. Federal | 88175396 | 10/30/2018 | (INT. CL. 25) SCARVES; SHIRTS; TOPS; WOMEN'S CLOTHING, NAMELY, SHIRTS, DRESSES, SKIRTS, BLOUSES; ATHLETIC TOPS AND BOTTOMS FOR YOGA |
| CURRENT STATE | U.S. Federal | 88175391 | 10/30/2018 | (INT. CL. 18) HANDBAGS, PURSES, WALLETS, BACKPACKS, TOTE BAGS, BEACH BAGS, SPORTS BAGS, DUFFEL BAGS, TRAVEL BAGS |
| CURRENT STATE | U.S. Federal | 88175375 | 10/30/2018 | (INT. CL. 14) JEWELRY AND WATCHES |
| CURRENT STATE | U.S. Federal | 88175370 | 10/30/2018 | (INT. CL. 3) COLOGNES; COSMETICS AND NON-MEDICATED SKIN CARE PREPARATIONS, NAMELY, FACE CREAM, NIGHT FACE CREAM, LIPSTICK, LIP DYE, COSMETIC LIP VOLUME MAXIMIZERS, LIP GLOSS, LIP MOISTURIZER, MASCARA, EYE |

| Trademark | Database | Application Number | Application Date | Goods and Services |
|---|---|---|---|---|
| | | | | SHADOW, EYE LINER, EYE CREAM, SACHET LIKE EYE PILLOWS CONTAINING FRAGRANCE, SKIN MOISTURIZERS, BODY SPRAY, BODY LOTION, FACE SPRAY, FACE LOTION, PERFUME, COLOGNE, NAIL ENAMEL, NAIL CONDITIONER, SKIN CREAMS AND SKIN LOTIONS, FACE MAKEUP, PRESSED POWDER, SCENTED LIP GLOSS, BODY SCRUB, SOAPS, BATH OIL, SHOWER GEL, BODY SPLASH, LOOSE FACE AND BODY POWDERS, FACE AND BODY GELS, TONERS, CLEANSERS, MASKS, PEELS, BODY POLISH AND FOOT SCRUBS; LIP BALM; NON-MEDICATED HAIR CARE PREPARATIONS, NAMELY, SHAMPOOS, CONDITIONERS AND OILS; ROOM FRAGRANCE SPRAY |
| TRIALCHEMY | U.S. Federal | 88131620 | 9/25/2018 | (INT. CL. 14) JEWELRY |

**Exhibit B**

**Form of Release and Restrictive Covenant Agreement**

(See attached)

**RELEASE AND RESTRICTIVE COVENANT AGREEMENT**

This RELEASE AND RESTRICTIVE COVENANT AGREEMENT (this "Agreement"), dated as of [●], is entered into by and among LC A&A Intermediate Investors LLC ("Lion"), a Delaware limited liability company, Alex and Ani Pledge Co., a Rhode Island corporation ("Pledge Co."), Carolyn Rafaelian (together with her affiliated vehicles, including Pledge Co., the "Founder") (each of Lion and the Founder, an "Investor", and together, the "Investors"), A and A Shareholding Co., LLC, a Delaware limited liability company (the "Company"), and Alex and Ani, LLC, a Delaware limited liability company ("Alex and Ani", and each of the Investors, the Founder, the Company and Alex and Ani a "Party", and collectively, the "Parties").

WHEREAS, on August [●], 2019, the Parties have entered into that certain Investor Matters Agreement (the "Investor Matters Agreement");

WHEREAS, pursuant to the Investor Matters Agreement, concurrently herewith the Parties are entering into the Assignment Agreement (as defined in the Investor Matters Agreement), pursuant to which, subject to the terms and conditions therein, certain intellectual property of Alex Ani shall be transferred and assigned to the Founder (the "IP Transfer");

WHEREAS, on [_____], the Founder's employment with the Company and its subsidiaries has been terminated;

WHEREAS, as a condition precedent to and consideration for the IP Transfer, the Founder agrees to enter into the agreements, covenants and release of claims set forth in this Agreement, in each case, in accordance with and subject to the terms hereof;

WHEREAS, the Founder acknowledges and agrees that it would be detrimental to the business and affairs of the Company and Alex and Ani (including, without limitation, the goodwill associated with the Company and its subsidiaries and its established employee relationships), if the Founder engaged in the conduct expressly prohibited by this Agreement;

WHEREAS, the Company, Alex and Ani and Lion have required, as a condition to the consummation of the IP Transfer, that the Founder execute and deliver this Agreement, and the Founder is executing and delivering this Agreement in order to induce such Parties to enter into the Assignment Agreement and consummate the IP Transfer, with all of the attendant financial and other benefits to the Founder; and

WHEREAS, the Founder acknowledges that the delivery of this Agreement to the other Parties thereof is a material element of the IP Transfer and this Agreement is executed by the Founder to protect the legitimate interests of the Company, Alex and Ani and Lion in the business, goodwill and established relationships of the Company and its subsidiaries.

NOW, THEREFORE, in consideration of the premises and mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Termination of Employment; Resignation**.

(a)    <u>Separation Date</u>.  The Founder acknowledges and agrees that her separation from the Company and its subsidiaries was effective as of _____, 20XX (the "<u>Separation Date</u>").

(b)    <u>Wages Fully Paid</u>.  The Founder acknowledges and agrees that she has received payment in full for all salary and other wages, including without limitation any accrued, unused vacation or other similar benefits earned through the Separation Date.

(c)    <u>Resignation</u>.  The Founder acknowledges and agrees that by executing this Agreement she shall be deemed to have resigned from all offices and positions she holds on the Separation Date with the Company and/or its subsidiaries and affiliates, whether as an employee, officer, director, agent, fiduciary, or otherwise [, other than the Founder's position as a member of the board of managers of the Company].

2.    **Release.**

(a)    For and in consideration for the IP Transfer, effective upon the execution of this Agreement, the Founder, on the Founder's own behalf and on behalf of the Founder's predecessors, successors, successors-in-interest, assigns, heirs, estate, and assigns ("<u>Releasors</u>"), voluntarily, knowingly, and willingly releases and forever discharges Lion and each of its current and former subsidiaries, affiliates, parents, shareholders, members, and owners, together with each of those entities' respective current and former officers, directors, managers, shareholders, members, owners, employees, agents, fiduciaries, and administrators (collectively, the "<u>Lion Releasees</u>"), and the Company and each of its current and former subsidiaries, affiliates, parents, shareholders, members, and owners, together with each of those entities' respective current and former officers, directors, managers, shareholders, members, owners, employees, agents, fiduciaries, and administrators (collectively, the "<u>Company Releasees</u>"), from any and all Claims and rights of any nature whatsoever that the Releasors now has or in the future may have against them, for any act, omission, or event occurring up to and including the date of this Agreement. For all purposes of this Agreement, "<u>Claims</u>" shall mean all claims (including, without limitation, crossclaims, counterclaims, and rights of setoff and/or recoupment), actions, causes of action, charges, complaints, suits, investigations, proceedings, debts, dues, sums of money, accounts, reckonings, interests, liens, liabilities, promises, warranties, damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, extents, executions, rights, torts, losses, rights to reimbursement, subrogation, contribution, indemnification or other payment, attorneys' fees, costs, expenses or other claims of whatever nature or kind, in each case whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, suspected or unsuspected, accrued or unaccrued, direct or indirect, foreseen or unforeseen, now existing or hereafter arising, in law, equity, or otherwise.

(b)    This release includes, but is not limited to, any rights or claims relating in any way to Founder's employment relationship with the Company or any of the other Company Releasees or the termination thereof, any contract claims (express or implied, written or oral), or any rights or claims under any statute, including, without limitation, the Americans with

Disabilities Act, the Age Discrimination in Employment Act ("ADEA", a law which prohibits discrimination on the basis of age), the Older Workers' Benefit Protection Act, the Rehabilitation Act of 1973 (including Section 504 thereof), Title VII of the 1964 Civil Rights Act, the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Civil Rights Act of 1991, the Equal Pay Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Family Medical Leave Act, the Lilly Ledbetter Fair Pay Act, the Genetic Information Non-Discrimination Act, the New York State Human Rights Law, the New York City Human Rights Law, and the Employee Retirement Income Security Act of 1974, all as amended, and any other federal, state, or local law.

(c)     This release specifically includes, but is not limited to, any claims based upon any right to the payment of wages, incentive and performance compensation, bonuses, equity grants, carried interest points, vacation, pension benefits, 401(k) plan benefits, stock benefits, or any other employee benefits, or any other rights arising under federal, state, or local laws prohibiting discrimination or harassment on the basis of race, color, age, religion, sexual orientation, religious creed, sex, national origin, ancestry, alienage, citizenship, nationality, mental or physical disability, denial of family and medical care leave, medical condition (including cancer and genetic characteristics), marital status, military status, gender identity, or any other basis prohibited by law.  The Founder understands that the releases set forth herein includes a release of claims arising under the ADEA.  The Founder hereby acknowledges and understands that, with respect to the release of claims under the ADEA only, the Founder shall have seven (7) days after executing this Agreement to revoke the release of claims under the ADEA.  The Founder acknowledges that the Founder has been advised that the Founder has twenty-one (21) days from the date of receipt of this Agreement to consider all the provisions of this Agreement and to the extent the Founder signs this Agreement prior to the expiration of such period the Founder does hereby knowingly and voluntarily waive the remaining portion of such twenty-one (21) day period.  Nothing in this Section 2 shall prevent the Founder from (i) initiating or causing to be initiated on the Founder's behalf any complaint, charge, claim or proceeding before any local, state or federal agency, court or other body challenging the validity of the waiver of the Founder's claims under ADEA contained in this Section 2 (but no other portion of such waiver) or (ii) initiating or participating in an investigation or proceeding conducted by the Equal Employment Opportunity Commission (provided that the Founder waives any right she may have to benefit in any manner from any relief (whether monetary or otherwise) arising out of any such or proceeding).  The Founder acknowledges that she has read the release set forth in this Section 2 carefully, has been advised by the Company to, and has in fact, consulted an attorney and fully understands that by signing below the Founder is giving up certain rights which she may have to sue or assert a claim against any of the Lion Releasees or Company Releasees, as described in this Section 2 and the other provisions hereof.  The Founder acknowledges that she has not been forced or pressured in any manner whatsoever to sign the release set forth in this Section 2, and the Founder agrees to all of its terms voluntarily.  Notwithstanding the foregoing, nothing herein, however, shall constitute a waiver of rights, obligations or claims (x) arising out of or relating to acts or omissions occurring after the date of this Agreement, (y) under this Agreement (including claims for breach of this Agreement), or (z) that cannot be waived by applicable law.

(d)     The Founder expressly acknowledges that the release set forth in this Agreement is intended to include in its effect, without limitation, claims that the Founder did not

know or suspect to exist in her favor at the time of execution hereof, regardless of whether the knowledge of such claims, or the facts upon which they might be based, would materially have affected the settlement of this matter, and that the consideration given under this Agreement is also for the release of those claims and contemplates the extinguishment of any such unknown claims.  In furtherance of this settlement, the Founder waives any rights she may have under California Civil Code Section 1542 (and other similar statutes and regulations).  Section 1542 states:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

(e)     The Founder affirms and warrants that she has made no assignment of any right or interest in any Claim that she may have against any of the Lion Released Parties or Company Released Parties.

3.     **Restrictive Covenants.**  As a condition precedent to and in consideration for the IP Transfer pursuant to the Assignment Agreement and the transactions contemplated thereby, the Founder hereby agrees that it shall not, for a period beginning on the date hereof and ending three (3) years from the date hereof (the "Restricted Period"; provided, however, in the event of any breach by the Founder of any of the restrictive covenants contained in this Section 3, the Restricted Period shall be extended by each day that the Founder is in breach of such covenant in order that the Company and its subsidiaries and Lion shall receive the full benefit of the Founder's compliance with each of the covenants contained in this Section 3), directly or indirectly, (i) solicit, knowingly encourage, or induce any individual who is then an officer or employee of the Company or any subsidiaries thereof to terminate their employment with the Company or any subsidiaries thereof, or (ii) hire, engage or employ any individual who is then, or who was during the twelve (12) month period immediately preceding the date of hire, engagement or employment, an officer or employee of the Company or any of its subsidiaries; provided, that for the avoidance of doubt, a general solicitation (including, but not limited to, the advertisement of job openings by use of newspapers, magazines, the internet and other media) or the use of search firms for solicitations, in each case, not specifically directed at such officers or employees shall not constitute a breach of this Agreement.  Notwithstanding the foregoing, the Founder shall be permitted to solicit and hire up to three (3) then current employees of the Company and/or its subsidiaries upon providing the Company with a written notice at least (10) days in advance of such solicitation or hire setting forth the names of the employees which the Founder intends to so solicit or hire.

4.     **Acknowledgement Respecting Restrictive Covenants**.  With respect to the restrictive covenants set forth in Section 3 hereof, the Founder acknowledges and agrees that the restrictions contained in this Agreement are reasonable in scope and duration in light of the purpose and intent of this Agreement and the consideration to the Founder and are necessary to protect the Company, its subsidiaries and Lion and that such parties are relying on the Founder's entry into the restrictions in this Agreement as a material condition to the IP Transfer.  The Parties intend that the covenants of this Agreement shall be deemed to be a series of separate covenants, one for each month for the applicable period following the Closing Date.  If, for any

reason any governmental authority determines that the restrictions in this Agreement are not reasonable, overbroad or unenforceable or that the consideration is inadequate in any jurisdiction or context, such restrictions shall be interpreted, modified or rewritten to include as much of the duration and scope as will render such restrictions valid and enforceable.  The Parties agree that the restrictive covenants contained in this Agreement shall be enforced independently of any other obligations among the Parties, and that the existence of any other claim or defense shall not affect the enforceability of this Agreement or the remedies hereunder. It is further agreed that it is impossible to measure in money the damages that will be suffered by the Company, its subsidiaries and Lion in the event that the Founder breaches any of the restrictions contained in this Agreement. Therefore, if the Company, its subsidiaries or Lion shall institute any action to enforce any such restriction, the Founder hereby waives the claim or defense that such parties have an adequate remedy at law and agrees not to assert in any such action the claim or defense that such parties has an adequate remedy at law. The Founder agrees that in the event it breaches or threatens to breach this Agreement, the Company, its subsidiaries and Lion will be entitled to specific performance of the terms of this Agreement, in addition to any other remedy to which it is entitled at law or in equity. This <u>Section 4</u> shall survive any termination of this Agreement.

5.  **Effective Date; Termination**.  This Agreement shall be effective on the date hereof; <u>provided</u>, that in the event that the Founder revokes the release with respect to claims arising under the ADEA in accordance with <u>Section 2(c)</u>, then the IP Transfer shall not be consummated and this Agreement and the Assignment Agreement shall each automatically terminate in its entirety and be of no further force and effect, other than the provisions of <u>Section 1</u> of this Agreement.

6.  **Other Provisions**.

(a)  <u>Entire Agreement.</u>  This Agreement together with the Assignment Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersede all prior agreements, written or oral, with respect thereto.

(b)  <u>Waivers and Amendments</u>.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(c)  <u>Governing Law</u>.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement, will be governed by and construed in accordance with the Laws of the State of Delaware without giving effect to principles or rules

of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

(d)     Process.  Each Party hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof to the address set forth next to such Party's signature in the signature pages attached hereto.

(e)     Waiver of Jury Trial.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS WAIVER OF JURY TRIAL.

(f)     Specific Performance.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that money damages or legal remedies would not be an adequate remedy for any such damages and it is accordingly agreed that the Buyer shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which it is entitled at law or in equity, and in seeking an injunction, a decree or order of specific performance, it shall not be required to provide any bond or other security in connection therewith.

(g)     No Third Party Beneficiaries; No Assignment.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  No Party may assign its rights or obligations hereunder without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed.  No assignment shall relieve the assigning Party of any of its obligations hereunder.

(h)     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(i)      <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first set forth above.


**CAROLYN RAFAELIAN**


By: _____


**ALEX AND ANI PLEDGE CO.**


By: _____


**LC A&A INTERMEDIATE INVESTORS LLC**


By: _____
Name:
Title:


**A AND A SHAREHOLDING CO., LLC**


By: _____
Name:
Title:


**ALEX AND ANI, LLC**


By: _____
Name:
Title:


*[Signature Page to Release and Restrictive Covenant Agreement]*