# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

CAROLYN RAFAELIAN, an individual, ALEX
AND ANI PLEDGE CO., a Rhode Island
Corporation and VENICE BEACH WALK, LLC,
a California  Limited Liability Company,

                       Plaintiffs,

v.

LC A&A HOLDINGS, INC., a Delaware
Corporation, LC A&A INTERMEDIATE
INVESTORS, LLC, a Delaware limited liability
Company, LYNDON LEA, an individual,
A and A SHAREHOLDING CO., LLC,
a Delaware limited liability company and
ROBERT TRABUCCO, an individual,

                       Defendants.

**Case No.: 1:20-CV-00247-MSM-PAS**

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION…………………………………………………………………2

II.     STATEMENT OF FACTS………………………………………………………...3

III.    STANDARD OF REVIEW…………………………………………………….....9

IV.     THE COMPLAINT PLEADS A CLAIM FOR SECURITIES FRAUD …………..10

     A.  The Complaint Pleads a Material Misstatement and Omissions………………..10

     B.  The Complaint alleges Fraud in Connection with
        the Purchase or Sale of a Security …………………………………………….12

     C.  The Complaint Adequately Pleads Scienter……………………………………..14

     D.  Plaintiffs Adequately Plead Justifiable Reliance………………………………15

     E.  The Compliant Pleads Loss of Causation……………………………………......16

     F.  Control Person Liability is Sufficiently Plead…………………………………17

V.      THE COMPLAINT STATES A CLAIM FOR COMMON LAW FRAUD ……......18

VI.     PLAINTIFFS DID NOT RELEASE THEIR CLAIMS IN THE IMA………...……..20

VII.    THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT….……..22

VIII.   DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF ARE
       PROPERLY BEFORE THE COURT…………………………………....................26

IX.     THIS COURT HAS PERSONAL JURISDICTION OVER LION DEFENDANTS....26

Plaintiffs, Carolyn Rafaelian, Alex and Ani Pledge Co. and Venice Beach Walk, LLC (collectively the "Plaintiffs"), by and through their undersigned attorneys, hereby submit their memorandum of law in opposition to Defendants, LC A&A Holding, Inc., LC A&A Intermediate Investors, LLC d/b/a Lion Capital (collectively "Lion Capital"), Lyndon Lea, A and A Shareholding Co., LLC and Robert Trabucco (collectively the "Defendants"), Motion to Dismiss Plaintiffs' Amended Complaint (the "Motion").[1]

## I.  Introduction

Defendants' Motion recasts the allegations in the Complaint and controlling law, as well as the clear and unambiguous terms of the subject contract, in an attempt to avoid responsibility for their tortious conduct. In connection with the restructuring of Rhode Island's leading jewelry company in September of 2019, Ms. Rafaelian was fraudulently induced into a complex restructuring transaction whereby she ceded control and majority ownership interest in the company she founded to London-based Lion Capital and invested $7 million in the company.

The alleged misrepresentation and omission arises out of the subject restructuring agreements themselves.  Under the federal securities laws, Defendants had a duty to disclose all materials facts a reasonable investor may consider relevant in connection with the restructuring, as well as a duty to disclose information as to not make any statement misleading.  In consideration and as a material inducement for her concessions, she received Lion Capital's clear and unconditional representation and promise that the company would fund two (2) new product lines of business in the amount of $1 million per year for two (2) years.  Immediately following her execution of the restructuring agreements, the company refused to fund the new product lines claiming it lacked sufficient funds.

---

[1] The Amended Complaint is referred to herein as the Complaint and cited as "¶__".  All defined terms used herein are the same as in the Complaint and have the same meaning.

The Complaint alleges Defendants knew that the company, under their control, would not or could not allocate its resources in a manner to provide any funding for such a venture. Defendants failed to disclose the same with the intent to induce Plaintiffs into the restructuring transaction for their own pecuniary gain in violation of the federal securities laws. The new product line funding was critical for Ms. Rafaelian which, but for, she would never have agreed to a $7 million investment in the Company and relinquishment of her control of operations. Indeed, she made in the $7 million investment, in part, specifically to fund the new venture.

Faced with the Complaint's well-pled allegations, Defendants offer a counter-narrative, argue this case out of context and attempt to rewrite the Complaint and contract documents. The Complaint's allegations, however, when considered in totality and in the context of the restructuring transaction as binding precedent requires, demonstrates that Defendants knowingly and recklessly made false statements and/or omitted material facts they had a duty to disclose. Defendants' motion should be denied in its entirely.

## II.     Statement of Facts

Founded in 2003, Alex and Ani, LLC (together with A and A Shareholding Co., LLC and its affiliated entities the ("Company") is a Rhode Island-based jewelry brand headquartered in East Greenwich, Rhode Island. ¶13 Carolyn Rafaelian, formerly a resident of Cranston, Rhode Island, is the founder of the Company and, prior to September 2019, was its Chief Executive Officer as well as its majority and controlling equity holder through an investment entity she controls, Alex and Ani Pledge Co. ("Pledge Co.").  ¶14

3

Lion Capital, is an affiliate of Lion Capital LLP, a London, England based private equity firm (collectively with their affiliated entities hereinafter ("Lion Capital").  ¶14  In 2014 and 2015, Lion Capital purchased private equity firm JH Partners' entire 40% interest in the Company for approximately $360 million.  ¶15

At all times relevant to this dispute, Lion Capital and its principal and managing partner, Lyndon Lea, were active stakeholders and owners of the Company, engaged in the weekly management of the Company. ¶16 In addition, at all times relevant hereto, the Company's Chief Restructuring Officer, Robert Trabucco, was an agent acting on behalf and at the direction of Lion Capital and Lyndon Lea. ¶17

During the summer of 2019, the Company was disputing an alleged default under a $100 million credit facility with Bank of America (the "BOA Loan"). ¶18 Lion Capital, at the time a minority and noncontrolling stakeholder, undertook direct communication and negotiation with Bank of America in a purported attempt to resolve the dispute.  ¶19

The product of Lion Capital's direct negotiation with Bank of America was a purported urgent need for a restructuring on the terms outlined in the Equity Restructuring – Binding Term Sheet dated August 14, 2019 between Lion Capital and Ms. Rafaelian (the "Binding Term Sheet"). ¶20 Ms. Rafaelian signed the Binding Term Sheet under duress on August 14, 2019 to avoid the purported liquidation of her Company and the loss of hundreds of jobs in Rhode Island. ¶21

Pursuant to the Binding Term Sheet, Ms. Rafaelian was to, among other things, divest Pledge Co.'s controlling equity interest and her management of the Company to Lion Capital and loan the Company $7 million, with $5 million of that amount being paid by Lion Capital in the form of a loan from Lion Capital to Ms. Rafaelian. ¶22

As consideration and a material inducement to enter into the Binding Term Sheet and cede control of the Company to Lion Capital, Mr. Lea represented to Ms. Rafaelian, through his agent Sherif Guirgis on August 14, 2019 as set forth in the Binding Term Sheet, that the Company could fund her new Current State and Tri-Alchemy lines of business in the amount of $1 million per year for two (2) years. ¶23 This funding was intended by Lion Capital and Mr. Rafaelian to provide Ms. Rafaelian with a viable platform to launch a new business should Lion Capital remove Ms. Rafaelian from her continued employment with the Company after the restructuring. ¶24 This term was also critical for Ms. Rafaelian to continue with her next generation of designs and commitment to Rhode Island manufacturing and job creation. ¶25

On September 13, 2019, the parties consummated the restructuring mandated under the Binding Term Sheet with the execution of numerous agreements including, without limitation, the Second Lien Credit Agreement, Secured Promissory Note and Investor Matters Agreement. ¶26 Specifically, on September 13, 2019, under duress with Lion Capital and the Company threatening the possibility of an imminent liquidation of the Company, Ms. Rafaelian executed, on behalf of Pledge Co., the Second Lien Credit Agreement (the "Credit Agreement"), pursuant to which Pledge Co. immediately loaned $7 million to the Company, payable with interest on or before January 31, 2022. ¶27

In purported consideration for making the $7 million loan under the Credit Agreement, Pledge Co. received 8,751,750 Class A Units (the "Class A Units") of the Company. ¶28 The Credit Agreement and Class A Units constitute securities pursuant to Section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1) (the "Securities Act"). ¶29

Contemporaneously with the execution of the Credit Agreement, Ms. Rafaelian executed the Secured Promissory Note (the "Note") in favor of Lion Capital. ¶30 The Note provides that

Ms. Rafaelian promises to pay Lion Capital $5 million within nine (9) months from the date of the Note, with interest accruing and payable in monthly installments at a rate of 3.5% per annum and, in the event of a default, interest shall increase to 15% per annum.  ¶31

Pursuant to Paragraph 4 of the Note, the $5 million proceeds of the Note were to be used by Ms. Rafaelian immediately upon receipt solely to make a capital contribution to Pledge Co., with Pledge Co. immediately using the proceeds to fund its $7 million loan to the Company under the Credit Agreement.  ¶32  Accordingly, the Note was part and parcel of the $7 million loan under the Credit Agreement. In fact, neither Ms. Rafaelian nor Pledge Co. ever received the $5 million proceeds under the Note, as those funds were wired directly to the Company from Lion Capital via the escrow agent for the closing.  ¶33

As security for the Note, Ms. Rafaelian was required to execute the Pledge Agreement (the "Pledge Agreement") on behalf of Pledge Co., pledging all of her equity in the Company as collateral for the Note. Ms. Rafaelian was also required to execute a Guaranty (the "Guaranty") on behalf of Venice Beach Walk, LLC ("Venice Beach") and Pledge Co., as well as the Deed of Trust with Assignment of Rents (the "Mortgage") for certain real property in California held by Venice Beach (the Note, Pledge Agreement, Guaranty and Mortgage collectively the "Lion Loan Agreements").  ¶34

As consideration for Lion Loan Agreements and the Credit Agreement, Lion Capital and the Company represented to Ms. Rafaelian that the Company could, and would, fund her new Current State and Tri-Alchemy product lines of business in the amount of $1 million per year for two (2) years (the "New Product Funding"). ¶35 Specifically, pursuant Paragraph 3(b) of the Investor Matters Agreement also dated September 13, 2019 (the "IMA Agreement"), executed by

Robert Trabucco as Chief Restructuring Officer for the Company, Mr. Trabucco represented to Ms. Rafaelian that the Company would provide the New Product Funding as follows:

> For a period of two (2) years following the Closing, the Company shall fund the operations of the Current State and Tri-Alchemy lines of business of Alex and Ani up to a total amount of $1 million per year, such amount to include all research and development costs and operating losses of such lines of business; provided, that the Company's obligations pursuant to this Section 3(b) shall terminate and be of no further force and effect upon the termination of employment of the Founder with the Company for any reason, whether the Founder is removed or resigns voluntarily.

¶36

Mr. Trabucco made this representation at the direction and with the instruction of Lion Capital's managing partner, Lyndon Lea, with the intent to induce Ms. Rafaelian into the Credit Agreement and Lion Loan Documents. ¶37

At the time Mr. Trabucco made this representation, he knew it was false and misleading because the Company lacked the resources to provide the New Product Funding. ¶38 Indeed, within days of the September 13, 2019 closing, Ms. Rafaelian met with Mr. Trabucco, the new Chief Executive Officer of the Company, in his office in East Greenwich, Rhode Island and was advised by Mr. Trabucco the Company could not afford to provide her any New Product Funding. ¶39

Also at this meeting, Ms. Rafaelian requested an explanation as to how the Company and Lion Capital could have just days earlier represented and agreed to have the Company provide the New Product Funding, if they knew the Company lacked the financial resources. ¶40 In response, Mr. Trabucco advised Ms. Rafaelian he was specifically instructed by Mr. Lea to execute the IMA Agreement without delay, which he did at Mr. Lea's direction.  ¶41

Ms. Rafaelian would never have agreed to her $7 million investment in the Company, which included her agreement to the Note in favor of Lion Capital, if she knew the Company did not have the resources to provide her New Product Funding.  ¶42  Indeed, the $7 million investment

she made in the Company was, in part, for the very purpose of funding her new business lines.

¶43. The misrepresentation also constitutes an event of default under Paragraph 8.01(d) of the Credit Agreement, which provides:

> Any representation, warranty, certification or statements of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Documents, or in any documents delivered in connection herewith shall be incorrect or misleading when made or deemed made

¶44 In addition, Page 1 of the IMA Agreement provides: "in exchange and consideration for the Parties entering into the Transaction Agreements and Lion making the loan to the Founder pursuant to the Lion-Founder Note, the Parties have agreed to enter into this Agreement." ¶45

Shortly thereafter, in early October of 2019, Ms. Rafaelian, or those acting on her behalf, inquired with Lion Capital regarding the timing of payment of interest under the Note.  In response, Mr. Lea confirmed in writing that all interest on the Note would be due at maturity. ¶46 In reliance upon this representation and understanding with Lion Capital, Ms. Rafaelian did not make any monthly interest payments on the Note.  ¶47

Approximately seven (7) months later, by letter dated April 15, 2020, Lion Capital held Ms. Rafaelian in default of the Note for allegedly failing to make monthly interest installment payments and charging her interest at a default rate of 15% per annum since the inception of the Note totaling more than $400,000. ¶48 Prior to April 15, 2020, and consistent with Ms. Rafaelian's understanding with Lion Capital, no allegation of default was ever made by Lion Capital.  ¶49

Shortly thereafter, on May 8, 2020, Ms. Rafaelian's employment with the Company was terminated. ¶50 Under Paragraph 3(c) of the IMA Agreement, Ms. Rafaelian was to receive the intellectual property to the Current State and Tri-Alchemy lines of business upon the earlier of 1) the sale of the Company; 2) termination of her employment or 3) two (2) years from the closing

of the Restructuring. In connection with her termination, the Company has demanded she execute a general release of any claims as a condition to receiving the intellectual property rights to the Current State and Tri-Alchemy tradenames, despite having never provided any New Product Funding for the business lines, which remain worthless and non-operational. ¶51 In addition, by letter dated June 4, 2020, Lion Capital has demanded payment in full of the $5 million Note with interest at 15% per annum.  ¶51

## III.    Standard of Review

To prevail on a Motion to Dismiss, the Defendant must meet the heavy burden of demonstrating that Plaintiffs have completely failed to state a claim for which relief may be granted. Under Federal Rule of Civil Procedure 12(b)(6), "[t]he sole inquiry . . . is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." OcasioHernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011). The court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011)). "[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Ocasio-Hernández, 640 F.3d at 12 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

Further, "[i]t is not necessary to plead facts sufficient to establish a prima facie case at the pleading stage." Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 54 (1st Cir. 2013) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)); see also Twombly, 550 U.S. at 569-70. Instead, to survive a motion to dismiss, a complaint must only contain "enough facts to state a claim to relief that is plausible on its face." A.G. ex rel. Maddox, 732 F.3d at 80 (quoting Twombly,

550 U.S. at 570). Assessing plausibility is a "context-specific task" in which the court may "draw on its judicial experience and common sense." A.G. ex rel. Maddox, 732 F.3d at 80 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

The First Circuit has admonished courts to avoid "thinking of plausibility as a standard of likely success on the merits," Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 30 (1st Cir. 2012), and has made clear that in assessing plausibility, a court may not "attempt to forecast a plaintiff's likelihood of success on the merits," Ocasio-Hernández, 640 F.3d at 13 (citing Twombly, 550 U.S. at 556). Dismissal is appropriate only if it appears that the plaintiff cannot recover on any viable theory, based on the facts alleged. Rosenberg v. City of Everett, 328 F.3d 12, 15 (1st Cir. 2003).

## Argument

### III.   The Complaint Pleads a Claim for Securities Fraud

To state a claim for securities fraud under §10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must show: (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011) (quoting Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, (2005)). Defendants argue Plaintiffs failed to plead any material misstatements or omissions, scienter, reliance and loss causation. Defendants are wrong and their motion should be denied.

#### A.  The Complaint Pleads Material Misstatements and Omissions

The Complaint establishes that Defendants made materially false statements and omissions in connection with the Restructuring to induce a securities transaction. The Complaint clearly and unequivocally alleges the statement in the IMA Agreement that the Company *shall* provide the

New Product Funding was false and misleading because at the time the IMA Agreement was executed the Company knew it could not perform such an obligation. In support thereof, the Complaint alleges immediately following the execution of the IMA Agreement, the Company advised Ms. Rafaelian it could not perform the agreement.  In addition, no performance ever occurred *whatsoever* thereafter during the eight (8) months proceeding the agreement's execution while Ms. Rafaelian was employed by the Company. See Luce v. Edelstein, 802 F.2d 49, 56, (2nd Cir. 1986) ("Plausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out or knowing they could not be carried out, and that they were not carried out, are sufficient under *Pross* to state a claim for relief under Section 10(b)").

Conversely, the Complaint also alleges an omission by the Defendants in failing to disclose that the Company could not perform the IMA Agreement and provide the New Product Funding. Disclosure is required when necessary "to make . . . statements made, in the light of the circumstances under which they were made,  not  misleading." 17  CFR  §  240.10b-5(b);  see also Basic Inc. v. Levinson, 485 U.S. 224, 239 (1988).

In their Motion, Defendants recast the Complaint in an attempt to make this case about representations or omissions regarding the financial condition of the Company. However, Plaintiffs' claims are not premised on the financial condition of the Company, but rather Defendants' representation the Company would perform a contractual obligation it had no present ability to perform. Defendants' conduct is particularly reckless and egregious because Plaintiffs specifically made their $7 million investment to enable the Company to provide the New Product Funding.

Indeed, the entire purpose of any "restructuring" is to enable a business to timely meet its obligations. That the Company post-Restructuring, under the control of the Defendants, would

not or could not allocate resources in a manner sufficient to enable the Company to provide *any* New Product Funding whatsoever was material information entirely within the domain of the Defendants and not disclosed to Plaintiffs. In the context of private securities litigation, the First Circuit has held that information is material if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." Rosen v. Textron, Inc., 321 F.Supp.2d 308, 317 (D.R.I. 2004).   In addition, the materiality of a particular statement is a question of fact that ordinarily is inappropriate for decision on a motion to dismiss and should instead be resolved by a jury.  Id. at 318.

Courts have noted that fraud in the purchase or sale of a security includes entering into a contract to sell a security with a secret reservation not to fully perform the contract.  See In re Phillips Petroleum Secs. Litig., 881 F.2d 1236, 1245 n.13 (3d Cir. 1989);  Luce, 802 F.2d at 56 (2d Cir. 1986).  It is a party's secret reservation not to fully perform a securities contract  that distinguishes these cases from routine breach of contract and common law fraud cases and brings them within the scope of Rule 10b-5.  United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1221 (10th Cir. 2000).

Accordingly, Plaintiffs have met their burden at this stage of the litigation in pleading a misrepresentation and omission under 10b-5.

### B. The Complaint alleges Fraud in Connection with the Purchase or Sale of a Security

 The Complaint adequately pleads fraud "in connection with" the purchase of a security and Defendants' Motion misstates the applicable standard.  The Exchange Act and its transactional nexus are to be interpreted "flexibly."  Serra v. Banco Santander P.R., 747 F.3d 1, 5 (1st Cir. 2014). A fraudulent misrepresentation or omission is made "in connection with" the purchase or sale of

the when "it is material to a decision by one or more individuals (other than the fraudster) to buy

or to sell a 'covered security.'" Id. citing Chadbourne & Parke LLP v. Troice, 134 S. Ct. 1058,

1066 (2014).

The Complaint draws a tight connection between the alleged fraud and the purchase of

securities:

> Ms. Rafaelian would never have agreed to her $7 million investment in the Company,
> which included her agreement to the Note in favor of Lion Capital, if she knew the
> Company did not have the resources to provide her New Product Funding. Indeed, the $7
> million investment she made in the Company was, in part, for the very purpose of funding
> her new business lines.

¶38.

Defendants sole argument is that the IMA Agreement is not a security.  However, the IMA

Agreement itself need not be a security to meet the nexus requirement, is it enough that the

agreement is part and part of a contemporaneous securities transaction which Plaintiff relied upon

in entering into the securities transaction. Sulkow v. Crosstown Apparel, Inc., 807 F.2d 33, 36

(2nd Cir. 1986) ("The agreement itself need not be a security for Rule 10b-5 to apply, so long as

the interest to be conveyed pursuant to the agreement is a security."). Indeed, the IMA

Agreement expressly obligates the parties to enter into the Credit Agreement, LLC Agreement

and Subscription Agreement for the issuance of Class A Units. The alleged fraud occurred

contemporaneously with the execution of the Note, Credit Agreement and the IMA Agreement.

"As such, the alleged misrepresentations and omissions were necessarily material to the plaintiffs'

decision to purchase securities, and so the misrepresentations and omissions were 'in connection

with' those securities transactions."  Serra, 747 F.3d at 5.

13

### C.  The Complaint Adequately Pleads Scienter

Scienter is an intention "to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976).  In this circuit, proving scienter requires "a showing of either conscious intent to defraud or a high degree of recklessness.'" Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)).

A court must accept a plaintiff's allegations as true and evaluate them "holistically" to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007).  The standard is met where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324. Explicitly rejecting a higher standard, the Supreme Court concluded that the inference of scienter "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." Id.

Defendants' Motion attempts to recast the allegations in the Complaint and asserts that scienter has not been plead because there is no allegation concerning an intention never to perform the IMA Agreement. However, no such allegation is necessary. Here, Defendants' scienter is illustrated by a known *inability* to perform a critical term of the restructuring contained in the IMA Agreement at the time of its execution.

14

The Complaint alleges 1) an explicit statement from the Company immediately after execution of the restructuring agreements declaring such an inability to perform; 2) no performance *whatsoever* during the eight (8) months of Ms. Rafaelian's subsequent employment with the Company and; 3) a clear motive not to perform – as Ms. Rafaelian was the intended beneficiary of the New Product Funding if and when her employment with the Company terminated, the Company was sold or in two (2) years following the restructuring. (IMA Agreement, ¶3(c). Defendants' conduct is particularly reckless and egregious because Ms. Rafaelian specifically made her $7 million investment to enable the Company to provide the New Product Funding. See Scritchfield v. Paolo, 274 F. Supp. 2d 163, 189 (D.R.I. 2003) (finding scienter where the plaintiffs alleged the defendants falsely represented they could provide services that the company could not provide). If the parties intended that the New Product Funding would be provided if and when the Company had sufficient resources, they would have stated so in the IMA Agreement.

Finally, the assertion that the Current State and Tri-Alchemy lines needed to first "incur" costs prior the Company's requirement to provide funding is flatly wrong. Not only is there no such condition precedent in the IMA Agreement, but operationally the assertion makes no logical sense as the product lines belong to the Company and the Company was obligated to fund these lines itself. Ms. Rafaelian was under no obligation to personally incur costs and seek reimbursement from the Company – nor was she ever asked to. Again, if the parties intended such a condition precedent, it would have been so stated in the clear and unambiguous terms of the IMA Agreement.

**D.  Plaintiffs Adequately Plead Justifiable Reliance**

Defendants next assert that the Complaint fails to allege justifiable reliance because Ms. Rafaelian was the CEO of Company and therefore could not justifiably rely on any statement or

omission regarding the financial condition of the Company. First, this is not a case about disclosure of financial information about the Company - the Complaint alleges fraud in connection with an inability to perform an affirmative contract obligation. Second, whether the reliance was reasonable or justified is a factual determination inappropriate for adjudication on a motion to dismiss, as such concerns raise issues of fact.  In re Salvatore, 33 B.R. 85, 86 (Bkr. R.I. 1983).

Third, Plaintiffs' reliance was not only justifiable, it was expressly bargained "in exchange and consideration for" the terms of the Restructuring in the IMA Agreement. Plaintiffs' reliance on an unconditional affirmative obligation under the IMA Agreement executed by the Company's Chief Restructuring Officer was entirely reasonable, particularly where Plaintiffs allege that they made the $7 million investment in the Company, in part, specifically to give the Company the ability to provide the New Product Funding. Indeed, the very purpose of any restructuring is to enable a company to meet its obligations, particularly those obligations contained in the restructuring agreement itself and bargained for in exchange for a stakeholder's investment in the Company.

### E.  The Complaint Pleads Loss Causation

The Complaint sufficiently pleads loss causation in the context of a privately held company at this stage of the litigation. Loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).

Here, Plaintiffs allege they were fraudulently induced into a private securities transaction - making a $7 million investment in the Company and entering into the various Restructuring agreements including the Lion Loan Agreements which they would not have done had they known the truth regarding the Company's ability to perform under the IMA Agreement. In this action, Plaintiffs seek, among other things, recovery of the $7 million investment and assert that their investment has been impaired by Defendants' tortious conduct.

Although it is not necessary in the context of privately held companies to alleged the stock price or value of the security itself declined in value, the Complaint asserts the Credit Agreement is in default and the Current State and Tri-Alchemy business lines of the Company, for which Pledge Co. received Class A Units, "remain worthless and non-operational." "To survive a motion to dismiss, Plaintiff need not allege facts identifying how much loss is attributable to its claim versus other factors so long as it alleges sufficient facts from which a reasonable fact-finder could find that some loss is attributable to the claim." Hartman v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.), 536 F.3d 1049, 1057 (9th Cir. 2008).

### F.  Control Person Liability is Sufficiently Plead

Section 20(a) of the Exchange Act imposes liability on persons who control other persons who violate the Act. "To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company." Aldridge, 284 F.3d at 85. Control is a question of fact that typically is improper for resolution on a motion to dismiss.  Bielski v. Cabletron Sys. (in Re Cabletron Sys.), 311 F.3d 11, 41 (1st Cir. 2002).

Plaintiffs have alleged that Mr. Lea and Mr. Trabucco exercised control over the Company. Specifically, the Complaint alleges, "Lion Capital and its principal and managing partner, Lyndon Lea, were active stakeholders and owners of the Company, engaged in the weekly management of the Company.   ¶17 In addition, Mr. Trabucco was the Chief Restructuring Officer who became the Chief Executive Officer and at all times worked as an agent on behalf Mr. Lea, and executed the IMA Agreement at the direction of Mr. Lea.   ¶18   Sekuk Global Enters. v. KVH Indus., No. 04-306ML 2005 WL 1924202 (D.R.I. Aug. 11, 2005) (denying motion to dismiss control liability claim where complaint alleged defendants exercised control due to their positions in the Company and were involved in making the subject misrepresentations).

IV.     **The Complaint States a Claim for Common Law Fraud**

Defendants' attempt at dismissal of the common law fraud count fails for the same reasons as set forth with respect to the securities fraud claim. To state a claim for fraud, a plaintiff must plead: (1) that defendant made a false representation (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation. GreenStar IH Rep, LLC v. Tutor Perini Corp., WL 5035567, at *10 (Del. Ch. Oct. 31, 2017).

The Complaint does not allege a mere breach of a promise bootstrapped into a fraud claim, but rather separate and independent conduct arising from Plaintiffs' fraudulent inducement into a $7 million investment in the Company and execution of the Lion Loan Agreements, Credit Agreement and IMA Agreement. The Complaint also does not allege a conclusory lack of intent to perform, rather, the Complaint alleges specific facts demonstrating an undisclosed *inability* to

perform a critical term of the restructuring contained in the IMA Agreement. The Complaint alleges 1) an explicit statement from the Company immediately after execution of the restructuring agreements declaring such an inability to perform; 2) no performance whatsoever during the eight (8) months of Ms. Rafaelian's subsequent employment with the Company and; 3) a clear motive not to perform – as Ms. Rafaelian was the intended beneficiary of the New Product Funding if and when her employment with the Company terminated.  "Contractual representations may form the basis for a fraud claim where a plaintiff has alleged facts 'sufficient to support a reasonable inference that the representations were knowingly false.'"  Prairie Capital III, L.P. v. Double E Holding Corp., 132 A.3d 35 (Del. Ch. 2015).  "Thus, the anti-bootstrapping rule does not apply where a plaintiff has made particularized allegations that a seller knew contractual representations were false or lied regarding the contractual representation, or where damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim."   Swipe Acquisition Corp. v. Krauss, C.A. No. 2019-0509 LEXIS 276, *25-27 (Del. Ch. August 25, 2020). Plaintiffs' have clearly met their burden of establishing more than a mere breach  of a promise.

The Complaint also alleges knowledge of the falsity, recklessness and failure to disclose. Mr. Lea and Mr. Trabucco were not only involved in the senior management of the Company, but were both leading and organizing the terms of the restructuring of the Company. The Complaint alleges Mr. Trabucco was the Chief *Restructuring* Officer of the Company, acting at the direction of Mr. Lea and Lion Capital, who had under "undertook direct communication and negotiation with Bank of America in a purported attempt to resolve" the alleged default of a $100 million credit facility.

In addition, the fraud claim seeks damages entirely separate from the breach of contract claim. The breach of contract claim seeks $1 million in damages, a foreseeable amount of New

Product Funding that should have been provided in reasonable allotments during the eight (8) months of Ms. Rafaelian's post-restructuring employment with the Company, and which the parties specifically intended and agreed to be allocated during the first one (1) year period. Conversely, the fraud claim seeks rescission of Ms. Rafaelian's $7 million investment in the Company and/or damages related thereto. Specifically, the Complaint seeks rescission of the Credit Agreement and a declaration the Lion Loan Agreement are void and unenforceable. "Even when a plaintiff asserts a fraud claim, damages do not have to be pled with particularity. What has to be pled with particularity are the circumstances constituting fraud or mistake. Unless a complaint seeks special damages, damages can be pled generally." Bamford v. Penfold, L.P., 2020 WL 967942, at *21 (Del. Ch. Feb. 28, 2020).

Finally, as set forth above, Plaintiffs have sufficiently alleged reliance and the reasonableness of such reliance is inappropriate for adjudication on a motion to dismiss. Plaintiffs' reliance on an unconditional affirmative obligation under the IMA Agreement was entirely reasonable, particularly where Plaintiffs allege that Ms. Rafaelian made the $7 million investment in the Company, in part, specifically to give the Company the ability to provide the New Product Funding.

## V.     Plaintiffs Did Not Release Their Claims in the IMA Agreement

Plaintiffs did not release claims related to fraud in connection with the Restructuring or the IMA Agreement. Release is an affirmative defense. Fed. R. Civ. P., Rule 8(c)(1). Dismissal "on the basis of an affirmative defense requires that (i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with  certitude." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006).

The party seeking enforcement of the release bears the heavy burden of proving that the released fraud claim was within the contemplation of the releasing party. Id. at 460.

Here, Defendants cannot establish with any certitude the fraud claims asserted were within contemplation of the Plaintiffs when they executed the IMA Agreement. The parties never intended to release fraud claims arising out of the Restructuring itself and, in fact, the subject release expressly states as such. The subject release is contained in the IMA Agreement itself, a release which was given "in exchange and consideration for" the parties entering into the Transaction Agreements and specifically and expressly excludes obligations arising under the Transaction Agreements.[2] ( IMA Agreement p. 1)

Specifically, the scope of release in the IMA Agreement is expressly qualified as follows: "provided, however, that the foregoing shall not release the Parties from their respective obligations under the Transaction Agreements." (IMA Agreement, p. 2) Accordingly, the parties did not waive or release any obligations, whether tort based or contractually based, arising out of the Transaction Agreements, which includes the IMA Agreement. "Thus there are two standards by which to judge the effectiveness of waivers--one for tort obligations and the other for contractual. Tort waivers must "clearly and unambiguously" disclaim the waiving party's obligation to conform its conduct to the requirements of tort law. Anderson v. Century Prods. Co., 943 F. Supp. 137, 150 (D.N.H. 1996). As set forth above, Defendants had obligations under the IMA Agreement to disclose all material facts and to make any statement in the IMA Agreement not misleading. There is no intention evidenced in the IMA Agreement to release or waive these obligations.  Had the parties so intended, they could have easily included such language in the release.

---

[2] The "Transaction Agreements" are defined in the IMA Agreement to include the IMA Agreement, Subscription Agreement, the Credit Agreement and Lion Loan Agreements.

In addition, the Complaint alleges fraudulent inducement into the IMA Agreement which contains the release.  ¶39  Here, the IMA Agreement contains to specific language. In fact, the language of Paragraph 2 of the IMA Agreement addressing exculpation of Lion Capital with respect to the Transaction Agreements specifically carves out claims for intentional fraud: "other than Claims arising out of or related to any act or omission of an exculpated part hereunder that is a criminal act or constitutes intentional fraud…"

Accordingly, Defendants cannot establish with any certitude the fraud claims asserted were within contemplation of the Plaintiffs when they executed the IMA Agreement.

**VI.    The Complaint States a Claim for Breach of Contract**

Despite the unambiguous terms of the IMA Agreement and the undisputed fact that no New Product Funding was ever made by the Company whatsoever during the eight (8) months of Ms. Rafaelian's post-restructuring employment with the Company, Defendants' Motion seeks dismissal of Ms. Rafaelian's breach of contract claim (Count IV) on the grounds she has failed to alleged breach of a contract and damages. In doing so, the Company invites the Court rewrite the clear and unambiguous terms of the IMA Agreement and allegations of the Complaint. Because the Complaint adequately pleads the elements of breach of contract the Motion should be denied as to Count IV.

As with Rhode Island law, Delaware law provides that to state a claim for breach of contract a plaintiff must plead the (1) existence of the contract; (2) the breach of an obligation

imposed by that contract and; (3) the resultant damage to the plaintiff.  VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).  The Complaint alleges the parties entered into the IMA Agreement which provides a clear, unconditional and unambiguous affirmative obligation under Paragraph 3(b) that the Company "**shall fund** the operations of the Current State and Tri- Alchemy lines of business **of Alex and Ani** up to a total amount of $1 million per year, such amount to include all research and development costs and operating losses of such lines of business." (emphasis added).

Defendants assert that there is no alleged breach under the IMA Agreement and, as grounds for their assertion, set forth a "theory" of Plaintiffs' case which is neither alleged in the Complaint. Specifically, nowhere in the Complaint does Ms. Rafaelian allege, nor has she ever contended, she was entitled to a $1 million check upon demand immediately after the Restructuring. First, the express language of the IMA requires the Company to fund its *own* lines of business up to $1 million per year – Current State and Tri-Alchemy are business lines of the Company.  Such funding was not payable to Ms. Rafaelian.

Defendants' reference to Paragraph 36 of the Complaint alleges that Mr. Trabucco advised Ms. Rafaelian that the Company could not afford *any* funding *whatsoever* for the new product lines, which certainly cannot be interpreted to mean Ms. Rafaelian was requesting $1 million immediately after closing of the transaction. ¶36 Ms. Rafaelian's grievance is that the Company was unable to provide *any* amount of funding whatsoever.

Specifically, as grounds for the breach, Mr. Rafaelian alleges that she was terminated on May 8, 2020 (nearly eight (8) months after the Restructuring) with the Company "having never provided any New Product Funding for the business lines, which remain worthless and non-operational." ¶¶ 46 47. Ms. Rafaelian further alleges "[t]he Company has materially and

substantially breached the IMA Agreement by failing and refusing to provide the New Product Funding as required under the agreement." Defendants attempt to recharacterizes the allegations in the Complaint to avoid responsibility under the IMA Agreement should be rejected.

Defendants second argument is that Ms. Rafaelian sustained no damages because she was to first incur operational costs on behalf of the Company as a condition precedent to the Company's obligations to provide the New Product Funding. Again, the Motion attempts to rewrite Paragraph 3(b) to require Ms. Rafaelian to first incur operational costs and seek reimbursement from the Company and a precondition to the Company's obligation under Paragraph 3(b). However, there is no such obligation of Ms. Rafaelian under the clear and unambiguous terms of the agreement which provides the Company *shall* provide funding. Paragraph 3(b) of the IMA Agreement provides an affirmative obligation of the *Company* to fund operations of its own business lines, with Ms. Rafaelian as the intended beneficiary if she is terminated or resigns from the Company, or otherwise as provided under Paragraph 3(c). Ms. Rafaelian is entitled to her foreseeable damages as the intended beneficiary of the IMA Agreement under Paragraph 3(c) proximately caused by the Company's breach. Ms. Rafaelian seeks $1 million in damages, a foreseeable amount of New Product Funding that should have been invested by the Company to develop the Current State and Tri-Alchemy business lines in reasonable allotments during the eight (8) months of Ms. Rafaelian's post-restructuring employment with the Company.

Even if such a condition precedent existed in the IMA Agreement, it would be waived by the Complaint's allegation that Mr. Trabucco advised Ms. Rafaelian the Company could not afford any New Product Funding. For Ms. Rafaelian to incur debts on behalf of the Company with knowledge that Mr. Trabucco was contending the Company could not afford such indebtedness, she would be liable to vendors for the same type of fraud the Company is being accused by Ms. Rafaelian in this action – namely – incurring an obligation with a knowing inability to perform.

Finally, had the parties intended Paragraph 3(b) be conditioned on the available financial resources of the Company or the requirement that Ms. Rafaelian first incur operational debt, they could have easily stated so in Paragraph 3(b). "When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." Lorillard Tobacco Co. v. Am. Legacy Found, 903 A.2d 728, 739 (Del. 2006).

Regardless, all that is required at this stage of the litigation is for Ms. Rafaelian to allege an agreement between the parties, its breach, and damages. The only "absurdity" here is Defendants' interpretation of the clear and unconditional language of Paragraph 3(b) of the IMA Agreement to essentially provide no obligation upon the Company at any time within the eight (8) months following the Restructuring to do anything, and thus rendering the terms of Paragraph 3(b) entirely illusory and superfluous.

The Complaint unequivocally alleges terms of an agreement under Paragraph 3(b) of the IMA Agreement, its breach in having never provided funding at any time and damages.

**VII.     The Counts for Declaratory Judgement and Injunctive Relief Are Properly Before the Court**

Counts VII & VIII for declaratory judgement and injunctive relief arise out of Defendants' fraudulent inducement of Plaintiffs into the Transaction Agreements and are properly before this Court. This action is a prior filed action commenced before Lion Capital's action in New York against the Plaintiffs.  That action is presently subject to Plaintiff's Motion to Dismiss in favor of this prior filed action, and well as for lack of personal jurisdiction. See Kalberer Declaration filed herewith.

As set forth in that motion, New York has absolutely no connection to this Restructuring, the conduct of the parties alleged herein, the Company or the claims asserted in this action. Dismissal of any claims related to the Lion Loan Agreement will result in piecemeal litigation and pose the threat of inconsistent judgements. Indeed, there is no personal jurisdiction over Pledge Co. or Venice Beach in New York, and the forum selection clause contained in the Note is entirely unreasonable in the context of the present litigation and does not provide any basis jurisdiction over Ms. Rafaelian for claims outside of the Note itself. For these reasons, the instant Motion should be denied in its entirety.

**VIII.    This Court has Personal Jurisdiction Over the Lion Defendants**

Specific and general jurisdiction over the Lion Defendants is clear. This dispute arises from a restructuring of a company headquartered in Rhode Island, which Mr. Lea and Lion Capital have been actively involved in the management of for years, whereby Lion Capital and Mr. Lea took over control and management of the Company.[3]

---

[3] Although outside the four corners of the Complaint, discovery will reveal Mr. Lea has traveled to Rhode Island routinely in connection with his management of the Company and attended meetings at its headquarters.

For a court properly to exercise specific personal jurisdiction over the defendant, the requirements of both the state's long-arm statute and the United States Constitution must be satisfied.  See Barrett v. Lombardi,  239 F.3d 23, 26 (1st Cir. 2001).  The Rhode Island long-arm statute, as interpreted by the Supreme Court of Rhode Island, is coextensive with federal due process mandates.  See Levinger v. Matthew Stuart & Co., Inc., 676 F. Supp. 437, 439 (D.R.I. 1988) (citing Conn v. ITT Aetna Fin. Co., 105 R.I. 397 (R.I. 1969)).  Therefore, Fourteenth Amendment due    processrequirements determine    the    exercise of personal jurisdiction in the District of Rhode Island.  Northeastern Land Servs., Ltd. v. Schulke, 988 F. Supp. 54, 57 (D.R.I. 1997).  "Due process demands minimum contacts between anonresident defendant and the forum such that the maintenance of the suit does not offend 'traditional  notions  of  fair play   and   substantial   justice.'"  Northeastern   Land   Servs.,   Ltd., 988 F.Supp. at 57 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, (1945)).

The First Circuit applies a three-part analysis in evaluating minimum contacts. See Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999).  First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable. Sawtelle, 70 F.3d at 1389 (quoting United Elec., Radio & Mach. Workers of Am., 960 F.2d 1089).

The claims in this action against the Lion Defendants clearly arise out of their forum state activities. The Complaint alleges "Lion Capital and its principal and managing partner, Lyndon

Lea were active stakeholders and owners of the Company, engaged in the weekly management of the Company," which is "a Rhode Island-based jewelry brand headquartered in East Greenwich, Rhode Island." While this allegation alone is sufficient to establish general jurisdiction, the Complaint goes further to detail specific forum-related conduct related to this dispute. "[A] defendant who has maintained a continuous and systematic linkage with the forum state brings himself within the general jurisdiction of that state's courts in respect to all matters, even those that are unrelated to the defendant's contacts with the forum." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999).

The Complaint further alleges that in 2019, "the Company was disputing an alleged default under a $100 million credit facility with Bank of America. Lion Capital, at the time a minority and noncontrolling stakeholder, undertook direct communication and negotiation with Bank of America in a purported attempt to resolve the dispute." ¶19  The Complaint further alleges Mr. Lea's negotiations with the bank led to a restructuring where Mr. Rafaelian would "cede control of the Company to Lion Capital" and also led to Ms. Rafaelian executing the Lion Loan Agreements and IMA Agreement, which serves as a basis for the fraud claims. Such allegations clearly suffice to establish relatedness for personal jurisdiction over the Lion Defendants. ¶22 Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994) (the relatedness test is a "flexible, relaxed standard"). Lion Defendants' allegation that Plaintiffs have not identified physical activity by them in Rhode Island is irrelevant. "A defendant need not be physically present in the forum state to cause injury (and thus 'activity' for jurisdictional purposes) in the forum state." Northern Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005).

To satisfy the second requirement, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking

the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." United Elec. Workers, 960 F.2d at 1089.  The focus in this second requirement is on "voluntariness and foreseeability." Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995). Here, is was entirely foreseeable that in owning a significant interest in a Rhode Island-based privately held company, involved in its weekly management, and leading restructuring efforts with the Company's primary lender, with the threat of liquidation, and inducing Plaintiffs into a restructuring transaction they knew the Company could not perform for their own benefit, they could cause harm in this forum and be hailed into a Rhode Island court. Indeed, Plaintiff Pledge Co. is a Rhode Island corporation operating exclusively in Rhode Island and holding Ms. Rafaelian's interest in the Company. See Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 915 F.2d 7, 11, (1st Cir. 1990) (finding a corporate officer who influenced or controlled actions of a company which affected Puerto Rico citizens sufficient for personal jurisdiction.);   Northern Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25-26 (1st Cir. 2005) (statements made outside of forum but likely to cause harm in forum sufficient to make it foreseeable defendants might be held accountable for his misrepresentations in a New Hampshire forum).

The Gestalt factors are: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies." Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

The factors favoring litigating this dispute in Rhode Island include interest in redressing harms against one of its leading employers and a Rhode Island Corporation, Pledge Co., as well as Pledge Co.'s interest in obtaining convenient and effective relief from a court in its own state,

and that the efficient administration of justice would be served given the Company, its employees and witnesses are located in or near this forum. With respect to Defendant's burden of appearing, there is no argument why the burden of defending a suit in Rhode Island outweighs the burden of defending a suit in any other jurisdiction. In addition, maintenance of this action in New York would result in piecemeal litigation and the potential for inconsistent judgements. As set forth above, there is no personal jurisdiction over Pledge Co. or Venice Beach in New York. And the purported forum selection clause in the Note only Ms. Rafaelian is a party to is limited only to claims arising out of the Note and inapplicable to the thrust of the claims in this action, or any claims arising out of the IMA Agreement.

## Conclusion

For the foregoing reasons, Defendants' Motion should be denied in its entirety.  If the Motion is granted in whole or in part, Plaintiffs respectfully request leave to amend.

Respectfully submitted,

**KALBERER LLP**

By: /s/ *Kurt T. Kalberer II*
Kurt T. Kalberer II, Esq. (#8007)
7 World Trade Center
250 Greenwich Street, 46th Floor
New York, NY 10004
Tel: (212) 266-0044
E-Mail: kkalberer@kalbererlaw.com
*Counsel for Plaintiffs Carolyn Rafealian,*
*Alex & Ani Pledge Co. and Venice Beach*
*Walk, LLC*

Dated: October 13, 2020

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 13, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification to all counsel of record and paper copies were sent to those indicated as non-registered participants.

*/s/ Kurt T. Kalberer II*
Kurt T. Kalberer II
